DETROIT EDISON COMPANY v PUBLIC SERVICE
COMMISSION NO 1
MICHIGAN ELECTRIC COOPERATIVE ASSOCIATION v
PUBLIC SERVICE COMMISSION
CONSUMERS ENERGY COMPANY v PUBLIC
SERVICE COMMISSION NO 1

Docket Nos. 237872, 237873, 237874. Submitted September 4, 2003, at
Lansing. Decided March 2, 2004, at 9:00 A.M. Leave to appeal
sought.

The Public Service Commission, on its own motion, initiated a
contested case proceeding to determine what modifications, if any,
should be made to codes of conduct previously adopted by the
commission and governing Detroit Edison Company and Consum-
ers Energy Company with respect to retail open access. Retail open
access allows customers of electric utilities to purchase power from
affiliates of the utilities or alternative electric power suppliers and
to have the utilities deliver the power to the customers. The codes
of conduct were designed to ensure that the utilities' affiliates did
not receive preferential treatment. The commission allowed sev-
eral parties to intervene. While the contested case proceeding was
ongoing, the Legislature enacted 2001 PA 141, MCL 460.10 *et seq.*,
which, among other things, required the commission to establish a
code of conduct applicable to all regulated electric utilities to
prevent cross-subsidization, information sharing, and preferential
treatment between a utility's regulated and unregulated services
regardless of whether those services are provided by the utility or
its affiliated entities. Following additional hearings in the con-
tested case proceeding, the commission issued an order adopting a
new code of conduct that applies to all electric utilities and
alternative electric suppliers and extends beyond retail open
access services. The code of conduct requires that competitive
services and products be offered through one or more affiliates of
a utility, and prohibits a utility from subsidizing its affiliates or
other entities; sharing its books and records with its affiliates or
other entities; sharing facilities, equipment, or operating employ-
ees with its affiliates or other entities; supplying financing or loan
support for its affiliates or other entities; engaging in joint
advertising with its affiliates or other entities; or unduly discrimi-

nating in favor of or against any party, including any of its affiliates. Detroit Edison, Consumers Energy, and Michigan Electric Cooperative Association appealed, and their appeals were consolidated.

The Court of Appeals *held*:

1. The commission did not misinterpret MCL 460.10a(4) and exceed its statutory authority by enacting a code of conduct that applies to unregulated services not directly related to retail open access. Act 141 granted the commission broad authority to enact a code of conduct to govern services unrelated to retail open access.

2. The code of conduct is not violative of the rulemaking provisions of the Administrative Procedures Act, MCL 24.201 *et seq*. The code of conduct was implemented through the issuance of orders in a contested case proceeding. MCL 24.207(f) defines "rule" to exclude a determination, decision, or order in a contested case.

3. The code of conduct does not usurp the appellants' management prerogatives. The code of conduct does not require a utility to cease any activity, to engage in any particular activity, or to offer any particular service.

4. The appellants' claim of federal preemption is without merit. The appellants have not carried the burden of demonstrating that the code of conduct is preempted by federal law in that they did not establish that Congress clearly intended that federal law preempt state law in this particular area, did not point to a specific conflict between state and federal law, and did not show that utilities would be unable to comply with both federal and state law.

5. The appellants have not demonstrated that the code of conduct is unconstitutionally vague. The code of conduct uses terms that are as reasonably precise as permitted by the subject matter and scope of the document, and provides fair notice of what conduct is prohibited. The code of conduct also permits a utility to request a waiver in circumstances in which the applicability of the code is unclear.

6. The appellants' claims that the code of conduct violates the Commerce Clause of the United States Constitution and constitutional provisions that prohibit the taking of private property without just compensation and the impairment of contracts are not ripe for review because they are speculative and have no factual context.

Affirmed.

*Bruce R. Maters* and *John P. Christinidis*, and *Foster, Swift, Collins & Smith, P.C.* (by *William K. Fahey* and *Stephen J. Rhodes*), for Detroit Edison Company.

· *Dykema Gossett PLLC* (by *Albert Ernst* and *Christine Mason Soneral*) for Michigan Electric Cooperative Association.

*David A. Mikelonis, Jon R. Robinson,* and *John C. Shea,* for Consumers Energy Company.

*Michael A. Cox,* Attorney General, *Thomas L. Casey,* Solicitor General, *David A. Voges, Henry J. Boynton,* and *David M. Gadaleto,* Assistant Attorneys General, for Public Service Commission.

*Clark Hill PLC* (by *Roderick S. Coy* and *Haran C. Rashes*) for Michigan Alliance for Fair Competition.

*Varnum, Riddering, Schmidt & Howlett LLP* (by *Eric J. Schneidewind*) for Energy Michigan, Inc.

Amicus Curiae:

*Clark Hill PLC* (by *Roderick S. Coy* and *Haran C. Rashes*) for Michigan Propane Gas Association.

Before: METER, P.J., and TALBOT and BORRELLO, JJ.

BORRELLO, J. In these consolidated cases, appellants Detroit Edison Company (DEC), Michigan Electric Cooperative Association, and Consumers Energy Company (CEC) appeal as of right from the orders entered by appellee Michigan Public Service Commission (PSC) imposing and modifying a code of conduct governing the relationships between the utilities and their affiliates. We affirm in each case.

I. UNDERLYING FACTS AND PROCEEDINGS

Beginning in 1997, the PSC issued a series of orders establishing the rates, terms, and conditions for retail open access for DEC and CEC, both of which are regulated suppliers of electric power. Retail open access allows the customers of a participating utility to purchase electric power from either a competitive affiliate of the utility or an alternative electric power supplier and to have the participating utility deliver the power to the customers. In 1999, the PSC approved provisional codes of conduct for DEC and CEC. These codes of conduct were approved in the context of a voluntary commitment by those utilities to offer retail open access and were designed to ensure that the utilities' unregulated affiliates did not receive preferential treatment in their service areas. On September 14, 1999, the PSC, acting sua sponte, initiated a contested case proceeding, docketed as Case No. U-12134, to determine what modifications, if any, should be made to the codes of conduct. The PSC granted motions to intervene filed by the Attorney General and appellees, and conducted an extensive contested case proceeding pursuant to the Administrative Procedures Act (APA), MCL 24.201 et seq.

Before a final order in Case No. U-12134 was issued, 2000 PA 141, the Customer Choice and Electricity Reliability Act (Act 141), MCL 460.10 et seq., became effective. The Legislature enacted Act 141 to further the deregulation of the electric utility industry in Michigan. Attorney General v Public Service Comm, 249 Mich App 424, 426; 642 NW2d 691 (2002). The stated purposes of Act 141 included: (a) ensuring that electric power customers have a choice of electric suppliers, (b) allowing the PSC to foster competition in the provision of electric supply and to maintain regulation of that supply, (c) encouraging the diversification of ownership of

electric supply, (d) ensuring that all persons in Michigan are provided reliable electric power at affordable rates, and (e) improving opportunities for economic development in Michigan and promoting competitive and financially healthy utilities. MCL 460.10(2).

Act 141 required the PSC to establish a code of conduct applicable to all regulated electric utilities. MCL 460.10a(4) provided:

> Within 180 days after the effective date of the amendatory act that added this section,[1] the commission shall establish a code of conduct that shall apply to all electric utilities. The code of conduct shall include, but is not limited to, measures to prevent cross-subsidization, information sharing, and preferential treatment, between a utility's regulated and unregulated services, whether those services are provided by the utility or the utility's affiliated entities. The code of conduct established under this subsection shall also be applicable to electric utilities and alternative electric suppliers consistent with section 10, this section, and sections 10b through 10bb.

In light of the requirement of MCL 460.10a(4) to produce a generally applicable code of conduct, the PSC issued an order providing for additional hearings in Case No. U-12134. Following the additional hearings, the PSC agreed to read the record, thus obviating the need for a proposal for decision. See MCL 24.281(1).

The PSC then issued an order adopting a new code of conduct applicable to all electric utilities and alternative electric suppliers. The PSC determined that the language of MCL 460.10a(4) indicated that the Legislature intended the code of conduct to apply beyond those services directly related to the retail open access market and stated as follows:

---

[1] Act 141 became effective June 5, 2000.

The Commission concludes, from the language of the
statute, that the Legislature intended the code of conduct
to apply beyond activities in the retail open access market.
The language of subsection 10a(4) is broad in declaring
that the code of conduct shall prevent subsidization, infor-
mation sharing, and preferential treatment "between a
utility's regulated and unregulated services." The Commis-
sion does not view it as an oversight that the Legislature
did not say "between a utility's regulated services and
retail open access services." In addition, the issue of the
scope of the code was before the Legislature. In that
context, the use of expansive language about the scope of
the code of conduct is a further indication that the Legis-
lature did not intend to limit the scope to only retail open
access.

The code of conduct required that competitive ser-
vices and products be offered through one or more
affiliates of a utility, i.e., separate corporations or other
entities within a corporate structure, such as a division.
To maintain the required separation between a utility
and an affiliate or a division, a utility was prohibited
from subsidizing its affiliates or other entities; sharing
books or records with its affiliates or other entities;
sharing facilities, equipment, or operating employees
with its affiliates or other entities; supplying financing
or loan support for its affiliates or other entities; or
engaging in joint advertising with its affiliates or other
entities. The code of conduct prohibited a regulated
utility from "unduly" discriminating in favor of or
against any party, including any of its affiliates. The PSC
concluded that the use of modifiers such as "unduly"
was appropriate to indicate that any difference in
treatment must be justified on a rational basis apart
from the relationship or lack of relationship between
the parties.

Various parties sought rehearing. The PSC granted
rehearing and issued an order making revisions to the

code of conduct. The PSC rejected appellants' argument that it lacked the statutory authority to adopt a code of conduct that extended beyond retail open access services, observing that the plain language of MCL 460.10a(4) did not limit the applicability of the code of conduct to only those services directly related to retail open access. The PSC observed that while the promotion of retail open access was one purpose of Act 141, another stated purpose was the promotion of economic development, and it concluded that a broad code of conduct, not one limited only to retail open access services, was consistent with the purposes of Act 141.

II. ANALYSIS[2]

The standard of review for PSC orders is narrow and well-defined. MCL 462.25 states that all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. *Michigan Consolidated Gas Co v Public Service Comm*, 389 Mich 624, 635-636; 209 NW2d 210 (1973). A party aggrieved by an order of the PSC has the burden of proving by clear and convincing evidence that the order is unlawful or unreasonable. MCL 462.26(8). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a mandatory statute or abused its discretion in the exercise of its judgment. *In re MCI*, 460

---

[2] Appellants argue that the PSC exceeded its authority by imposing the code of conduct on unregulated activities not related to retail open access, that the PSC violated the APA by failing to promulgate the code of conduct as a rule, that the code of conduct impermissibly usurps management activities, that the code of conduct is unconstitutionally vague, that the code of conduct is invalid at least in part because it is preempted by federal law, and that the code of conduct violates various provisions of the United States Constitution. For the sake of clarity and to avoid undue repetition, we have grouped appellants' issues into those categories.

Mich 396, 427; 596 NW2d 164 (1999). An order is unreasonable if it is not supported by the evidence. *Associated Truck Lines, Inc v Public Service Comm*, 377 Mich 259, 279; 140 NW2d 515 (1966).

We give due deference to the PSC's administrative expertise and will not substitute our judgment for that of the PSC. *Attorney General v Public Service Comm No 2*, 237 Mich App 82, 88; 602 NW2d 225 (1999). A reviewing court must give "great weight to *any reasonable construction of a regulatory scheme that the* PSC *is empowered to administer*," *Champion's Auto Ferry, Inc v Public Service Comm*, 231 Mich App 699, 708; 588 NW2d 153 (1998) (emphasis added), but the court may not abandon its responsibility to interpret statutory language and legislative intent, *Miller Bros v Public Service Comm*, 180 Mich App 227, 232; 446 NW2d 640 (1989). A reviewing court does not afford the same measure of deference to an agency's initial interpretation of new legislation as it does to a longstanding interpretation. *In re Telecom Tariffs*, 210 Mich App 533, 538; 534 NW2d 194 (1995). Whether the PSC exceeded the scope of its authority is a question of law that we review de novo. *In re Complaint of Pelland Against Ameritech Michigan*, 254 Mich App 675, 682; 658 NW2d 849 (2003).

The primary goal of statutory interpretation is to give effect to the intent of the Legislature. The first step in determining legislative intent is to review the language of the statute itself. If the language of the statute is unambiguous, the reviewing court must presume that the Legislature intended the meaning expressed, and judicial construction is neither required nor permitted. If the language of the statute is ambiguous, judicial construction to determine its meaning is appropriate. *In re MCI, supra* at 411. The Legislature is

presumed to be familiar with the rules of statutory construction and is charged with knowledge of existing laws on the same subject. *Inter Coop Council v Dep't of Treasury*, 257 Mich App 219, 227; 668 NW2d 181 (2003). In addition, the Legislature is presumed to act with knowledge of administrative and appellate court statutory interpretations. *Gordon Sel-Way, Inc v Spence Bros, Inc*, 438 Mich 488, 505-506; 475 NW2d 704 (1991).

### A. SCOPE OF PSC STATUTORY AUTHORITY

On appeal, appellants argue that the PSC misinterpreted MCL 460.10a(4) and exceeded its statutory authority by enacting a code of conduct that applies to unregulated services not directly related to retail open access, such as appliance repair and fiber optic installation, whether those services are provided by the utility or the utility's affiliates. Appellants further assert that MCL 460.10a(4) provides that the code of conduct shall be applicable to electric utilities and alternative electric suppliers consistent with the provisions of Act 141. Therefore, appellants argue, the clear and unambiguous language of Act 141 indicates that the Legislature intended the code of conduct mandated by MCL 460.10a(4) to apply only to those activities directly related to retail open access. We disagree because we find that MCL 460.6 grants the PSC broad authority over all matters pertaining to public utilities.

The purposes of Act 141 relate to the generation and supply of electric power and all other matters within the traditional and untraditional roles of the appellants. Here, the PSC interpreted MCL 460.10a(4) by enacting a code of conduct that controls regulated and unregulated services. We find that in so doing, the PSC was fulfilling its legislative mandate. We find that the PSC did not

abuse its discretion in holding that it was granted broad authority to enact a code of conduct to govern services unrelated to retail open access. We find that the PSC was correct in asserting that the Legislature used expansive language to describe the scope of the code of conduct. Because of this expansive language, it follows that the Legislature intended to allow the PSC to adopt the challenged code of conduct. Additionally, because one purpose of Act 141 is to promote economic development, it follows that the Legislature, by assigning oversight of the Act 141 to the PSC, intended that the code of conduct would come under the auspices of the PSC.

### B. APA RULEMAKING PROCEDURES

Next, appellants argue that the PSC's orders are unlawful because the PSC failed to comply with the APA's rulemaking provisions when implementing the code of conduct. The code of conduct falls within the APA's definition of a rule because it establishes substantive standards of general applicability that have the force and effect of law. Furthermore, appellants note that unlike other subsections in MCL 460.10a, MCL 460.10a(4) does not authorize the PSC to issue orders to achieve certain goals. Again, we disagree with appellants' arguments.

In Michigan, the preferred method of agency policy-making is by the promulgation of rules. *Detroit Base Coalition for the Human Rights of the Handicapped v Dep't of Social Services*, 431 Mich 172, 185; 428 NW2d 335 (1988). The APA defines a "rule" as "an agency regulation, statement, standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by the agency, or that prescribes the organization, procedure, or practice of the agency . . . ." MCL 24.207. The APA incorpo-

rates several exceptions to the definition of a rule, including a "determination, decision, or order in a contested case," MCL 24.207(f), and a "decision by an agency to exercise or not to exercise a permissive statutory power, although private rights or interests are affected," MCL 24.207(j).

Here, the code of conduct is not a rule because it was implemented via orders entered in a contested case. MCL 24.207(f) allows for an exception as a basis for its decision to forgo complying with the APA's rulemaking procedures. That statute states, in relevant part:

> "Rule" means an agency regulation, statement, standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by the agency, or that prescribes the organization, procedure, or practice of the agency, including the amendment, suspension, or rescission of the law enforced or administered by the agency. Rule does not include any of the following:
>
> * * *
>
> *(f) A determination, decision, or order in a contested case.* [*Id.* (emphasis added).]

See also *In re Public Service Comm Guidelines for Transactions Between Affiliates*, 252 Mich App 254, 267; 652 NW2d 1 (2002); *AFSCME v Wayne Co*, 152 Mich App 87, 98; 393 NW2d 889 (1986).

These proceedings were conducted as a contested case in that the order commencing the matter listed DEC and CEC as parties and provided them and the intervening parties with the opportunity for a hearing as required by MCL 24.203(3). The PSC's renoticing of the proceedings for the purpose of complying with MCL 460.10a(4) and implementing a code of conduct appli-

cable to all electric utilities and having the force and effect of law does not change the dynamic of a contested case.

Furthermore, while an agency's decision to exercise discretionary statutory authority does not constitute rulemaking, MCL 24.207(j), its implementation of that authority is subject to the APA's rulemaking procedures, *AFSCME v Dep't of Mental Health*, 452 Mich 1, 13; 550 NW2d 190 (1996). The plain language of MCL 460.10a(4) requires the PSC to implement a code of conduct within a specified period. However, unlike other subsections of MCL 460.10a, MCL 460.10a(4) did not authorize the PSC to implement such a code by order. Appellants argue that absent this direct authorization, the PSC was not enabled to implement a code of conduct. By reading MCL 460.10a in its entirety, we find that the Legislature clearly intended for the PSC to implement a code of conduct.

### C. USURPATION OF MANAGEMENT AUTHORITY

Next, appellants argue that the PSC exceeded its authority by implementing a code of conduct that usurps their management prerogatives. Appellants contend that the code of conduct improperly attempts to assume management of the method by which a utility offers a service or product; the method by which a utility organizes its business records; the business relationship between a utility and its affiliates; the relationship between a utility and its employees; advertising, marketing, and other promotional activities engaged in by a utility and its affiliates; the relationship between and among a utility, its affiliates, and its customers; and over whether a utility's affiliates conduct business outside Michigan. Because appellants' desired interpretation could be construed to prevent the PSC from

overseeing any of appellants' business practices, we find this argument without merit.

The PSC's authority to regulate a utility's rates and charges does not include the power to make management decisions for the utility. *Union Carbide Corp v Public Service Comm*, 431 Mich 135, 148; 428 NW2d 322 (1988). We hold that the PSC did not intrude on the management decisions of the regulated electric utilities by implementing the code of conduct. MCL 460.10a(4) required the PSC to implement a code of conduct to prevent cross-subsidization, information sharing, and preferential treatment between a utility's regulated and unregulated activities and services. The code of conduct does not require a utility to cease any activity, to engage in any particular activity, or to offer any particular service. Cf. *Detroit Edison Co v Public Service Comm*, 221 Mich App 370, 386-389; 562 NW2d 224 (1997). The PSC may encourage a specific management decision through the exercise of its authorized powers, but it cannot directly order the utility to make the decision. *Union Carbide, supra* at 148. Appellants have not demonstrated that the PSC's orders unlawfully infringe upon their management activities. *In re MCI, supra.*

### D. PREEMPTION OF CODE OF CONDUCT BY FEDERAL LAW

Next, appellants argue that to the extent that the PSC has attempted to regulate an electric utility's affiliates that are not involved in the provision of retail open access supply, it has encroached on matters that are exclusively regulated by the Federal Energy Regulatory Commission (FERC). Appellants assert that the Federal Power Act, 16 USC 791a *et seq.,* and the FERC's regulations completely occupy the field and leave no room for the PSC to exercise parallel regulation.

Under the Supremacy Clause, US Const, art VI, § 2, federal law preempts state law in three circumstances: (1) where Congress has expressed an intent to preempt state law; (2) where state law regulates conduct in a field that Congress intended to occupy on an exclusive basis; and (3) where state law actually conflicts with federal law. Generally, a presumption exists against federal preemption of state law, and preemption will be found only when it is the clear intent of Congress. *Wayne Co Bd of Comm'rs v Wayne Co Airport Auth*, 253 Mich App 144, 197-198; 658 NW2d 804 (2002). The burden of proof is on the party claiming preemption. *Konynenbelt v Flagstar Bank, FSB*, 242 Mich App 21, 29; 617 NW2d 706 (2000). Appellants have not carried the burden of demonstrating that the PSC's code of conduct is preempted by federal law in that they did not establish that Congress clearly intended that federal law preempt state law in this particular area, did not point to a specific conflict between state and federal law, and did not show that utilities would be unable to comply with both federal and state law. Appellants' claim of preemption is general and insufficient to overcome the presumption against federal preemption. *Wayne Co Bd of Comm'rs, supra.*

### E. ALLEGATION OF VAGUENESS

Next, appellants argue that the code of conduct is unconstitutionally vague in that it does not give fair notice of what conduct is prohibited. Appellants claim that the code of conduct's use of undefined terms such as "affiliate," "equipment," and "operating employees" provides no guidance as to how a regulated utility is to conduct its activities, and the prohibition against a utility subsidizing "in any manner, directly or indirectly, the business of its affiliates" does not provide a

utility with fair notice of what sort of business relationship, if any, it is allowed to have with any other entity.

A statute may be challenged for vagueness on the grounds that it: (1) is overbroad and impinges on First Amendment freedoms; (2) does not provide fair notice of what conduct is proscribed; or (3) is so indefinite that it confers unstructured and unlimited discretion on the trier of fact to determine whether an offense has been committed. *Dep't of Social Services v Emmanuel Baptist Preschool,* 434 Mich 380, 419-420; 455 NW2d 1 (1990) (CAVANAGH, J.). Vagueness challenges not involving First Amendment freedoms are analyzed in light of the facts of the particular case. *In re Gosnell,* 234 Mich App 326, 334; 594 NW2d 90 (1999).

The PSC's code of conduct is not unconstitutionally vague. To provide fair notice of the conduct proscribed, a statute must give a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited. *Id.* The code of conduct does not specify each and every activity in which every regulated utility is prohibited from engaging or in which the utility is permitted to engage; however, that degree of specificity would be impossible in a single document designed to apply to all electric utilities. The code of conduct does not specify the manner in which utilities are to take steps to achieve the required functional separation from their affiliates; however, such specificity would constitute an impermissible usurpation of the utilities' management decisions. *Union Carbide Corp, supra* at 148. The code of conduct uses terms that are as reasonably precise as permitted by the subject matter and scope of the document. Furthermore, the code of conduct permits a utility to request a waiver in circumstances in which the applicability of the code of conduct

is unclear. Appellants have not demonstrated that the code of conduct is unconstitutionally vague. *Gosnell, supra* at 333-334.

### F. CONSTITUTIONAL ISSUES

Finally, appellants argue that the code of conduct violates various provisions of the United States Constitution. Specifically, appellants contend that the code of conduct violates the Commerce Clause, US Const, art I, § 8, cl 3, the prohibition against the taking of private property without just compensation, US Const, Am V, and the prohibition against the impairment of contracts, US Const, art I, § 10.

At this point in the proceedings, appellants' constitutional claims are speculative and have no factual context. We hold that the claims are not ripe for review at this time.

### III. CONCLUSION

For the reasons set forth, we affirm the decision of the PSC.